**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE:  TESTOSTERONE REPLACEMENT | ) | |
| THERAPY PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Case No. 1:14-cv-1748 |
| | ) | MDL No. 2545 |
| This Document Relates To: | ) | |
| | ) | |
| *Holtsclaw v. Endo Pharmaceuticals, Inc., et al.* | ) | |
| Case No. 1:15-cv-3941 | ) | |
| | ) | |
| *Owens v. Auxilium Pharmaceuticals, Inc.* | ) | |
| Case No. 1:14-cv-5180 | ) | |

**DEFENDANTS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT ON THE GROUND THAT PLAINTIFFS' STATE LAW
FAILURE TO WARN AND DESIGN DEFECT CLAIMS ARE PREEMPTED BY
FEDERAL LAW**

Andrew K. Solow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Phone:  (212) 836-7740
Fax:  (212) 836-6776
Email:  andrew.solow@apks.com

Pamela J. Yates (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Phone:  (213) 243-4178
Fax:  (213) 243-4199
Email:  pamela.yates@apks.com

*Attorneys for Endo Pharmaceuticals Inc.,
Auxilium Pharmaceuticals, LLC (f/k/a Auxilium
Pharmaceuticals, Inc.), and GlaxoSmithKline
LLC*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .................................................................... 2

    A.    Plaintiffs Challenge the Adequacy of Testim's FDA-Approved Labeling and Design ............................................................................................... 2

    B.    FDA Oversight of Prescription Medicines ............................................... 3

        1.    FDA Approval of Medicines for Marketing ................................. 3

        2.    FDA Responsibility for Prescription Medicine Labeling ........................ 3

        3.    FDA Responsibility for Prescription Medicine Design ............................ 4

    C.    FDA's Exercise of its Regulatory Authority Over Testim ..................................... 5

        1.    FDA Approval of Testim as Safe and Effective for Use as TRT .............. 5

        2.    FDA's Determination that Evidence of CV and VTE Risk Did Not Satisfy the Standard for a Warning Disclosure in Testim Labeling .......... 6

            a.    In 2011, FDA Determined that Results of the TOM Trial Using Testim Did Not Merit a Warning on Testim Labeling About CV Risk..................................................................................... 7

            b.    FDA's Review of Evidence Concerning VTE Risk ...................... 8

            c.    In June 2014, FDA Rejected Auxilium's Proposed Labeling Language Regarding Thrombosis and Embolic Events.................. 9

            d.    In July 2014, FDA Rejected a Citizen Petition Seeking to Amend TRT Labeling to Include a Warning Regarding CV Risk ........................................................................................... 11

            e.    FDA Subsequently Determined that Further Study is Necessary to Evaluate an Association Between CV Risk and TRT Medicines..................................................................... 12

STANDARD OF REVIEW ........................................................................................ 13

ARGUMENT ........................................................................................................... 13

I.    PLAINTIFFS' CLAIMS CHALLENGING THE ADEQUACY OF TESTIM'S FDA-APPROVED LABELING ARE PREEMPTED BY FEDERAL LAW ................. 13

A.  Clear Evidence Shows that FDA Would Have Rejected an Attempt by Auxilium to Add a CV Risk Warning While Mr. Holtsclaw Used Testim .......... 14

B.  Clear Evidence Shows that FDA Would Have Rejected an Attempt by Auxilium to Add a VTE Risk Warning While Mr. Owens Used Testim ............. 16

C.  The Testim Regulatory Record Satisfies the Court's Preemption Criteria .......... 17

II.  PLAINTIFFS' CLAIMS CHALLENGING TESTIM'S FDA-APPROVED DESIGN ARE PREEMPTED BY FEDERAL LAW ....................................................... 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barcal v. EMD Serono, Inc.*,
    No. 5:14-cv-01709, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016) ..........................................4

*Booker v. Johnson & Johnson*,
    54 F. Supp. 3d 868 (N.D. Ohio 2014) .....................................................................................20

*Cerveny v. Aventis, Inc.*,
    855 F.3d 1091 (10th Cir. 2017) .........................................................................14, 16, 17, 18

*Fleming v. Janssen Pharm., Inc.*,
    186 F. Supp. 3d 826 (W.D. Tenn. 2016) ................................................................................20

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
    142 F. Supp. 3d 1108 (S.D. Cal. 2015) ............................................................................14, 18

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    Case No. 14 C 1748, 2017 WL 1836435 (N.D. Ill. May 8, 2017) .................................. *passim*

*Mason v. SmithKline Beecham Corp.*,
    596 F.3d 387 (7th Cir. 2010) ......................................................................................... *passim*

*Mutual Pharm. Co. v. Bartlett*,
    133 S. Ct. 2466 (2013) ......................................................................................5, 18, 19, 20

*PLIVA, Inv. v. Mensing*,
    564 U.S. 604 (2011) ................................................................................................................2

*Rheinfrank v. Abbott Labs., Inc.*,
    119 F. Supp. 3d 749 (S.D. Ohio 2015) ..................................................................................14

*Robinson v. McNeil Consumer Healthcare*,
    615 F.3d 861 (7th Cir. 2010) ...........................................................................................14, 15

*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016) ...................................................................................20

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ..........................................................................................................1, 13

*Yates v. Ortho-McNeil-Janssen*,
    808 F.3d 281 (6th Cir. 2015) ........................................................................................2, 19, 20

**Statutes**

18 U.S.C. § 1001 ............................................................................................................................17

21 U.S.C. § 355(a) ............................................................................................................................3

21 U.S.C. § 355(b) ............................................................................................................................3

21 U.S.C. § 355(b)(1)(F) ..................................................................................................................3

21 U.S.C. § 393(b)(2)(B) ..................................................................................................................3

**Other Authorities**

21 C.F.R. § 201.1 ..............................................................................................................................3

21 C.F.R. § 201.57(c)(6)(i) ...............................................................................................1, 2, 4, 16

21 C.F.R. § 208.20(a)(1) ...................................................................................................................8

21 C.F.R. § 208.20(a)(2) ...................................................................................................................8

21 C.F.R. § 312.20 ............................................................................................................................3

21 C.F.R. § 312.23 ............................................................................................................................3

21 C.F.R. § 312.23(a)(8) ...................................................................................................................3

21 C.F.R. § 312.33 ............................................................................................................................3

21 C.F.R. § 312.40 ............................................................................................................................3

21 C.F.R. § 314.50 ............................................................................................................................3

21 C.F.R. § 314.50(d)(2) ...................................................................................................................3

21 C.F.R. § 314.50(d)(3) ...................................................................................................................3

21 C.F.R. § 314.50(d)(5) ...................................................................................................................3

21 C.F.R. § 314.70(b) ........................................................................................................................2

21 C.F.R. § 314.70(b)(1) ...............................................................................................................4, 5

21 C.F.R. § 314.70(b)(2)(i) .............................................................................................................19

21 C.F.R. § 314.70(b)(2)(v)(A) ........................................................................................................4

21 C.F.R. § 314.70(b)(4) ...................................................................................................................4

21 C.F.R. § 314.70(c)(6)(iii)(A) .................................................................................2, 4, 16

21 C.F.R. § 314.80 ...........................................................................................................4

21 C.F.R. § 314.80(a) .....................................................................................................16

21 C.F.R. § 314.81 ...........................................................................................................4

21 C.F.R. § 314.105 .........................................................................................................3

21 C.F.R. § 314.125 .........................................................................................................3

21 C.F.R. § 314.125(b)(8) ...............................................................................................4

21 C.F.R. § 314.126 .........................................................................................................3

21 C.F.R. § 314.150(b)(3) ...............................................................................................4

## PRELIMINARY STATEMENT

Plaintiffs' failure to warn claims are preempted because Auxilium proposed—and FDA rejected—the changes that each Plaintiff contends Auxilium should have made to the Testim label regarding cardiovascular ("CV") risk. The Auxilium regulatory record fundamentally distinguishes Testim from the AbbVie AndroGel bellwether cases and satisfies the Court's preemption criteria. *See In re Testosterone Replacement Therapy Prods. Liab. Litig.*, Case No. 14 C 1748, 2017 WL 1836435, at *7–11 (N.D. Ill. May 8, 2017) ("CMO 46").

Plaintiff Steven D. Holtsclaw contends that Auxilium should have added a warning to Testim labeling about alleged CV risk. It is undisputed that prior to, during, and again just two weeks after Mr. Holtsclaw's Testim use, FDA determined that the standard for adding such a warning—"reasonable evidence of a causal association" of CV risks with Testim use, 21 C.F.R. § 201.57(c)(6)(i)—was not satisfied based on then-available evidence. Significantly and unique to Testim's regulatory history, in June 2014—only one month before Mr. Holtsclaw's heart attack and after FDA announced an investigation into whether TRT medicines are associated with CV risk—FDA rejected Auxilium's proposed labeling language regarding "thrombosis and embolic events"—medical terminology that encompasses stroke and heart attack—because "FDA's requested labeling changes were based on our review of cases of **venous** thromboembolism (DVT, PE), and not arterial thromboembolism (strokes, heart attacks)." Ex. 1 at 35662 (emphasis in original). FDA's determinations, including its rejection of language proposed by Auxilium, constitute "'clear evidence' that the FDA would have rejected attempts by [Auxilium] to make the change to the label that [Mr. Holtsclaw] contend[s] was omitted." CMO 46, at *7 (citing *Wyeth v. Levine*, 555 U.S. 555, 571–72 (2009)).

When Plaintiff Isaac A. Owens used Testim, the labeling warned of potential "**serious side effects including: . . . Blood clots in the legs**." Ex. 2 at 123991–92 (emphasis in original). Although Mr. Owens experienced that precise risk, he contends that the Testim labeling should have warned more generally of a risk of venous thromboembolism ("VTE"), including deep vein thrombosis ("DVT") and pulmonary embolism ("PE"). A pharmaceutical manufacturer like Auxilium is permitted to make labeling changes before FDA approval ***only*** if the updated warning is supported by "evidence of a causal association that satisfies the standard for inclusion in the labeling." 21 C.F.R. § 314.70(c)(6)(iii)(A). When it examined evidence relating to VTE risk, FDA added class labeling language regarding reported VTE events, which alone are not evidence of a causal association. *See* 21 C.F.R. § 201.57(c)(6)(i). FDA has never found "reasonable evidence of a causal association" of VTE with Testim, which is clear evidence that FDA would not have approved a labeling change proposed by Auxilium to add that warning.

Both Plaintiffs assert state law design defect claims. A manufacturer cannot alter a medicine's design absent prior FDA approval. 21 C.F.R. § 314.70(b). Plaintiffs' design defect claims are preempted because Auxilium would not be able to satisfy a state law duty relating to Testim's design "without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *PLIVA, Inv. v. Mensing*, 564 U.S. 604, 623–24 (2011); *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281, 298–300 (6th Cir. 2015).

## STATEMENT OF UNDISPUTED FACTS

### A. Plaintiffs Challenge the Adequacy of Testim's FDA-Approved Labeling and Design

Mr. Owens used Testim sporadically beginning in July 2011. On July 12, 2013, he was diagnosed with DVT in his left leg, which he alleges was caused by Testim. Owens Compl. ¶ 83. Mr. Holtsclaw used Testim from December 10, 2013 through July 3, 2014 when he had a

heart attack, which he alleges was caused by Testim. Holtsclaw Short Form Compl. ¶¶ 9–11, 14.

Each Plaintiff asserts state law failure to warn claims challenging the adequacy of Testim's

FDA-approved labeling and state law design defect claims challenging Testim's FDA-approved

design. Owens Compl. ¶¶ 89–95, 132–39; Holtsclaw Short-Form Compl. ¶ 17.

### B. FDA Oversight of Prescription Medicines

#### 1. FDA Approval of Medicines for Marketing

When a pharmaceutical manufacturer is developing a new medicine and before it is

marketed to the public, it must submit an investigational new drug application ("IND") to FDA.

An IND must contain a proposed protocol for studying the medicine in humans. 21 C.F.R.

§§ 312.20, 312.23, 312.40. During the investigation, the manufacturer is required to report

serious safety information to FDA as that information becomes available. 21 C.F.R.

§ 312.23(a)(8). More generally, the manufacturer is required to submit periodic reports to FDA

on the progress of the investigation. 21 C.F.R. § 312.33.

If the manufacturer desires to market the new medicine, the manufacturer must submit a

"new drug application" ("NDA") to FDA that includes, among other things: (1) nonclinical

pharmacology and toxicology studies; (2) human pharmacokinetics and bioavailability studies;

and (3) clinical studies concerning the safety and effectiveness of the medicine. 21 U.S.C.

§§ 355(a)–(b), 21 C.F.R. §§ 314.50(d)(2)–(3), (5). FDA approves a new medicine for marketing

only if it determines after study that the medicine is "safe and effective" for its intended uses.

21 U.S.C. § 393(b)(2)(B); 21 C.F.R. §§ 314.105, 314.125, 314.126.

#### 2. FDA Responsibility for Prescription Medicine Labeling

As part of the NDA process, FDA approves the exact language that appears on medicine

labeling. 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50; 21 C.F.R. § 201.1. FDA will reject an

NDA if it finds that the "drug product's proposed labeling does not comply with the

requirements for labels and labeling in part 201." 21 C.F.R. § 314.125(b)(8). Among other things, Part 201 requires a warnings disclosure when there is "reasonable evidence of a causal association with a drug" and a "clinically significant hazard." 21 C.F.R. § 201.57(c)(6)(i).

Most changes to the initial FDA-approved labeling require the manufacturer to submit a Prior Approval Supplement ("PAS") before implementation. 21 C.F.R. § 314.70(b)(2)(v)(A) and (b)(4). However, a manufacturer may make labeling changes that "reflect newly acquired information," including to "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling"—a "changes being effected" or CBE labeling change—prior to FDA approval. 21 C.F.R. § 314.70(c)(6)(iii)(A); *see also* 21 C.F.R. § 201.57(c)(6)(i).

After approval, manufacturers must provide to FDA (a) contemporaneous reporting of serious and unexpected adverse experiences; (b) periodic reporting of subsequent published and unpublished clinical research concerning the medicine; and (c) a brief summary of significant new information about the medicine and whether any of that information necessitates a change to the labeling. 21 C.F.R. §§ 314.80, 314.81. FDA can withdraw approval of an NDA based on new information if it determines that the labeling "based on a fair evaluation of all material facts, is false or misleading in any particular, and the labeling was not corrected by the [manufacturer] within a reasonable time after" notification from FDA. 21 C.F.R. § 314.150(b)(3).

### 3. FDA Responsibility for Prescription Medicine Design

A pharmaceutical manufacturer is not permitted to change a medicine's design unilaterally. *See, e.g.*, *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016) ("no . . . process exists for [unilateral] changes" to a medicine's design). FDA regulations explicitly provide that any "major change" that might "adverse[ly] effect . . . the identity, strength, quality, purity, or potency" of the medicine requires prior FDA

approval.  21 C.F.R. § 314.70(b)(1).  In short, "were [a pharmaceutical manufacturer] to change the composition of its [medicine], the altered chemical would be a new drug that would require its own NDA to be marketed . . . ."  *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2475 (2013).

### C.  FDA's Exercise of its Regulatory Authority Over Testim

#### 1.  FDA Approval of Testim as Safe and Effective for Use as TRT

Auxilium submitted its IND for Testim on November 22, 2000.  Ex. 3.  In the ensuing months, Auxilium submitted protocols for studies to assess Testim's efficacy and safety.  The pivotal study involved 406 men between the ages of 35 and 80 whose testosterone levels were below 300 ng/dl and who had one or more symptoms associated with low testosterone, including fatigue, decreased muscle mass, reduced libido, or reduced sexual functioning.  Approximately 65% of the subjects "were diagnosed with secondary hypogonadism of unknown etiology, but perhaps associated with aging."  Ex. 4 at 16.

The clinical study compared Testim both to placebo and to a previously approved TRT medicine, Androderm 5 mg patch.  Its primary objective was to assess Testim's safety and efficacy in normalizing testosterone levels in men with levels below 300 ng/dl.  *Id.* at 13.  A secondary objective was to assess Testim's efficacy in improving hypogonadal symptoms, including body composition, sexual functioning, mood, and bone mineral density.  *Id.*

On December 31, 2001, after completion of that trial, Auxilium filed an NDA seeking FDA approval to market Testim.  *See* Ex. 5; Ex. 6.  On October 20, 2002, the FDA Medical Officer in charge of FDA's review recommended that FDA approve the NDA.  Ex. 4 at 4, 49.  He concluded that the "benefit/risk ratio demonstrates a steady effect on normalization of testosterone with attendant improvement in physiology and sexual function with a low risk of adverse effects," which "favors making [Testim] available for commercial use."  *Id.* at 29.  On October 30, 2002, the FDA Medical Team Leader made the same recommendation.  Ex. 7.

5

On October 31, 2002, FDA accepted those recommendations and approved Testim for use. Ex. 8. The FDA-approved labeling, in effect while Plaintiffs used Testim, provided that "Testim™ is indicated for testosterone replacement therapy in adult males for conditions associated with a deficiency or absence of endogenous testosterone," including "idiopathic gonadotropin . . . ." *Id.* at 12. The Clinical Pharmacology section explained that "[s]ymptoms associated with male hypogonadism include decreased sexual desire with or without impotence, fatigue and loss of energy, mood depression, regression of secondary sexual characteristics, and osteoporosis." *Id.* at 4. The labeling also reported that, in the clinical trials, "patients receiving Testim™ 100 mg daily showed significant improvement from baseline in multiple sexual function parameters," including "sexual motivation, sexual desire, sexual activity and spontaneous erections." *Id.* at 10.

### 2. FDA's Determination that Evidence of CV and VTE Risk Did Not Satisfy the Standard for a Warning Disclosure in Testim Labeling

At the time, FDA considered Auxilium's IND and NDA for Testim, "[e]xogenous testosterone ha[d] been available for decades and ha[d] been widely used and studied." Ex. 4 at 47; *see* Ex. 9 at 2 ("Testosterone has been approved or used as a drug in the United States since the 1940s"). During that time, "[o]bservational studies have shown that generally low testosterone in men is associated with the worsening of biomarkers of cardiovascular health," and "[r]andomized controlled trials have shown that testosterone supplementation generally improves some biomarkers of cardiovascular health." *Id.* at 2–3. Four studies published before and while Mr. Holtsclaw used Testim considered alleged CV risk associated with TRT medicines. FDA considered those studies and other evidence and determined that they did not establish reasonable evidence of an association of CV risk with TRT medicines.

        a.      *In 2011, FDA Determined that Results of the TOM Trial Using Testim Did Not Merit a Warning on Testim Labeling About CV Risk*

On July 8, 2010, the New England Journal of Medicine published results from a clinical trial of Testosterone in Older Men ("TOM"), which was designed to assess the effects of TRT (specifically using Testim) on "lower-extremity strength and physical function in older men [over the age of 65] with limitations in mobility." Basaria, et al., *Adverse Events Associated with Testosterone Administration*, 363 New Engl. J. Med. 109, 110 (2010) ("Ex. 10"). The TOM trial had been stopped prematurely on December 31, 2009, because 23 out of 106 patients taking Testim (as compared with 5 out of 103 taking a placebo) experienced CV events ranging from peripheral edema to high blood pressure to myocardial infarction. *Id.* at 112, 114–15. The authors noted that "the differences detected between the two trial groups may have been due to chance alone" (*id.* at 118), and stated that the findings did not impugn the safety of the medicine in the broader population: "The small size of the trial and the unique population prevent broader inferences from being made about the safety of testosterone therapy." *Id.* at 109.

On January 13, 2010, FDA was notified that the TOM trial "had been stopped because of an excess of cardiovascular adverse events in the testosterone treatment arm." Ex. 11 at 55817. Two days later, FDA opened a Tracked Safety Issue ("TSI") "to provide a comprehensive regulatory history of the potential safety issue." Ex. 12. FDA committed to obtain additional information and "meet shortly thereafter to discuss the findings and try to put these findings into perspective based on the totality of information available regarding adverse events associated with testosterone therapy in men." Ex. 11 at 55817–18.

After its review, FDA concluded that the TOM trial "had several significant limitations that precluded a definitive assessment of the role of testosterone therapy in the cardiovascular events noted in the study." Ex. 9 at 6. FDA explained that there were very few major adverse

cardiac events ("MACE"), and "the testosterone and placebo groups were not balanced for cardiovascular risk factors, which could explain the imbalance in MACE between the two groups." *Id.* In addition, examination of two meta-analyses of clinical trials and a systematic qualitative review "did not support an association between testosterone therapy and an increased risk of adverse cardiovascular outcomes." *Id.* at 6–7; *see* Ex. 13 at 29041–46. On January 3, 2011, FDA closed the TSI and concluded that information regarding an association between CV risk and TRT medicines did not warrant regulatory action. Ex. 14 at 2. As Plaintiffs' expert, Dr. Peggy Pence, testified when FDA closes a TSI that means that FDA has "determined at that point that, based on what they've reviewed, they don't believe there's a safety signal on which they need to act." Pence Dep. ("Ex. 15") at 302:21–24.

> b.    *FDA's Review of Evidence Concerning VTE Risk*

The FDA-approved labeling in effect while Mr. Owens used Testim disclosed that 1% of patients using Testim 50 mg and 2% of patients using Testim 100 mg in clinical trials experienced increased hematocrit/hemoglobin. Ex. 8 at 17–18. The labeling recommended that "[h]emoglobin and hematocrit levels should be checked periodically (to detect polycythemia) in patients on long-term androgen therapy." *Id.* at 15. The Medication Guide—intended to provide patients with "scientifically accurate" information in "nontechnical understandable language" (21 C.F.R. § 208.20(a)(1)–(2))—in effect while Mr. Owens was treated warned that "**TESTIM can cause serious side effects including:** . . . **Blood clots in the legs**. This can include pain, swelling or redness of your legs." Ex. 2 at 123991–92 (emphasis in original).

On March 26, 2014—more than seven months after Mr. Owens's DVT—FDA informed Auxilium that it was aware of new information regarding adverse event reports of patients experiencing VTE while using TRT medicines. Ex. 16. Although "[t]he risk of venous blood clots [was] already included in the labeling of testosterone products as a possible consequence of

polycythemia," FDA determined that the "labeling of all testosterone products [should] provide a more general warning regarding venous blood clots." Ex. 17. On June 19, 2014, FDA approved updated Testim labeling to warn that "[t]here have been postmarketing reports of venous thromboembolic events, including deep vein thrombosis (DVT) and pulmonary embolism (PE), in patients using testosterone products, such as Testim." Ex. 18. The labeling also disclosed that information in the section addressing Adverse Reactions/Postmarketing Experience and the Medication Guide was modified to warn: "**Testim can cause serious side effects, including:** . . . **Blood clots in the legs or lungs**." *Id.* (emphasis in original).

        c.     *In June 2014, FDA Rejected Auxilium's Proposed Labeling Language Regarding Thrombosis and Embolic Events*

Between April 2013 and February 2014 three additional published articles—a meta-analysis reviewing then-existing literature (Xu) and two articles reporting results of independent studies (Vigen and Finkle)—examined an association between TRT medicines and CV risk.[1] On December 17, 2013, after publication of the Xu and Vigen articles, FDA reopened the TSI. Ex. 22. On January 31, 2014, based on the Vigen and Finkle articles, FDA announced that it was "investigating the risk of stroke, heart attack, and death in men taking FDA-approved testosterone products." Ex. 23. FDA stated that it had "not concluded that FDA-approved testosterone treatment increases the risk of stroke, heart attack, or death," and that "[p]atients should not stop taking testosterone products without first discussing any questions or concerns with their health care providers." *Id.*

---

[1] Xu, et al., *Testosterone Therapy and Cardiovascular Events Among Men*, BMC Medicine, 2013 ("Ex. 19"); Vigen, et al., *Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels*, 310 J. Am. Med. Ass'n 1829, 1829–36 (2013) ("Ex. 20"); Finkle, et al., *Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men*, PLOS ONE Jan. 2014, at 1–7 ("Ex. 21").

On April 24, 2014, in connection with FDA's determination that the labeling of Testim and all TRT medicines should be updated to include safety information regarding VTE events, Auxilium submitted a PAS proposing that Testim labeling be updated more broadly to provide information about "embolism and thrombosis," medical terminology which encompasses heart attack and stroke:

> Auxilium accepts FDA's request to add this new safety information to the prescribing information for Testim. However, Auxilium disagrees with the FDA proposal to include the term "venous thromboembolic events" or "VTE" [a MedDRA lower level term (LLT)] in the labeling. **Instead, Auxilium proposes to utilize the term "embolism and thrombosis"**. This term is a MedDRA high level group term (HLGT) in the vascular system organ class, which includes the preferred terms of deep vein thrombosis (DVT), pulmonary embolism (PE), and thrombosis, and the LLT of VTE.

Ex. 24 (emphasis added). The March 2014 MedDRA Guide in effect at the time, explicitly included "[i]nfarction- and stroke-related events" in the category of "[e]mbolic and thrombotic events." Ex. 25 at 76.

By email dated June 2, 2014, FDA rejected Auxilium's proposed language, expressly rejecting medical terminology that encompassed stroke and heart attack in the Testim label:

> We do not concur with the more general text of "thrombosis and embolic events." FDA's requested labeling changes were based on our review of cases of **venous** thromboembolism (DVT, PE), and not arterial thromboembolism (strokes, heart attacks). Therefore, we believe "venous thromboembolism" is the most accurate text, clinically and scientifically, to describe the said warning.

Ex. 1 at 35662 (emphasis in original). Thus, just one month before Mr. Holtsclaw's heart attack and five months after FDA reopened the TSI regarding CV risk, it rejected Auxilium's proposal to add specific safety information that would have encompassed CV risk, including specifically heart attack and stroke. This is "'clear evidence' that the FDA would have rejected attempts by [Auxilium] to make the change to the label that [Mr. Holtsclaw] contend[s] was omitted." CMO 46, at *7.

10

    d.  *In July 2014, FDA Rejected a Citizen Petition Seeking to Amend*
       *TRT Labeling to Include a Warning Regarding CV Risk*

  Following the FDA Safety Announcement, on February 25, 2014, relying on the Basaria,

Xu, Vigen and Finkle studies, Public Citizen filed a citizen petition ("Petition") regarding CV

risk allegedly associated with TRT medicines.  The Petition asked FDA to require a black box

warning and updating of the Medication Guide regarding alleged CV risk on the labeling of TRT

medicines, and to require TRT manufacturers to send "Dear Doctor" letters to physicians about

the alleged risk.  Ex. 26 at 1370715–21.

  On July 16, 2014, thirteen days after Mr. Holtsclaw stopped using Testim, FDA denied

the relief sought in the Petition because "at this time, ***there is insufficient evidence of a causal***

***link between testosterone therapy and adverse cardiovascular outcomes*** . . . ."  Ex. 9 at 5

(emphasis added).  FDA explained that each of the Basaria, Xu, Vigen, and Finkle studies "have

significant limitations that weaken their evidentiary value for confirming a causal relationship

between testosterone and adverse cardiovascular outcomes."  *Id.* at 15.  FDA also "identified

other studies in the literature that contradict the findings in the studies submitted."  *Id.*  This is

additional compelling evidence that FDA would have rejected attempts by Auxilium to make the

change to the label Mr. Holtsclaw contends was omitted.  FDA stated that it was "continuing to

assess this potential safety signal," and would "present the question of the potential association

between testosterone and adverse cardiovascular events to an Advisory Committee this fall."  *Id.*

at 16.[2]

---

[2] "In particular, [FDA was] awaiting the results of the Testosterone Trial," which it believed
would "yield important information regarding the safety of testosterone with regard to
cardiovascular risks."  Ex. 9 at 16.  The results of that trial involving 790 men over 65 years old,
which were published in 2016, found "[n]o significant between-group differences . . . in cardiac
adverse events" in those men given testosterone gel and those given placebo gel.  Snyder, et al.,
                             (continued...)

   *e.*  *FDA Subsequently Determined that Further Study is Necessary to Evaluate an Association Between CV Risk and TRT Medicines*

   FDA convened a joint meeting of the Bone, Reproductive and Urologic Drugs and the Drug Safety and Risk Management Advisory Committees on September 17, 2014, to consider the indications for, and potential CV risk associated with, TRT medicines. Ex. 28. On February 9, 2015, based on the Advisory Committee's advice, FDA notified Auxilium that it determined that "the potential for cardiovascular risk be included in labeling" for Testim, and "that only a clinical trial (rather than a nonclinical or observational study) will be sufficient to assess the signal of a serious risk of MACE associated with the class of testosterone therapy . . . ." Ex. 29 at 2, 3. On March 3, 2015, FDA delivered the same message to the general public. Ex. 30. As a result, on May 11, 2015, FDA approved an update to the warnings section of the Testim labeling:

> **5.5 Cardiovascular Risk**
> Long term clinical safety trials have not been conducted to assess the cardiovascular outcomes of testosterone replacement therapy in men. To date, epidemiological studies and randomized controlled trials have been ***inconclusive*** for determining the risk of major adverse cardiovascular events (MACE), such as non-fatal myocardial infarction, non-fatal stroke, and cardiovascular death, with the use of testosterone compared to non-use. Some studies, but not all, have reported an increased risk of MACE in association with use of testosterone replacement therapy in men. Patients should be informed of this ***possible risk*** when deciding whether to use or to continue to use Testim.

Ex. 31 (emphasis added); Ex. 32.[3]

---

*Effects of Testosterone Treatment in Older Men*, 374 New Engl. J. Med. 611, 611, 622 (2016) ("Ex. 27").

[3] At the same time, the labeling was modified to remove the word "idiopathic" from the indications and usage section, add a limitation that Testim's safety and efficacy in men with "age-related hypogonadism" has not been established, and remove the discussion that the clinical trial results had shown Testim's efficacy in improving sexual function and body mass composition.

As FDA requested, Auxilium is working with other TRT manufacturers to design a study to assess CV risk. Shusterman Dep. ("Ex. 33") at 21:5–22:15. In the meantime, since the May 2015 labeling change, several published studies have reported no increased, or a decreased, CV risk associated with TRT medicines. The most recent review of the scientific literature concluded that "[t]here is no credible evidence at this time that testosterone therapy increases cardiovascular risk, but there is substantial evidence that it does not." Goodale, et al., *Testosterone and the Heart*, 13 Hous. Methodist DeBakey J. 68, 70 (2017) ("Ex. 34") (internal citation omitted). Mr. Holtsclaw's expert, Dr. Hossein Ardehali, concedes that, even today, "there is no consensus on this issue in the scientific community." Ardehali Dep. ("Ex. 35") at 129:19–130:13.

## STANDARD OF REVIEW

As this Court has explained, summary judgment is appropriate when, construing the facts in the light most favorable to the non-moving party, "there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law." CMO 46, at *7 (citation omitted). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at *7.

## ARGUMENT

**I.     PLAINTIFFS' CLAIMS CHALLENGING THE ADEQUACY OF TESTIM'S FDA-APPROVED LABELING ARE PREEMPTED BY FEDERAL LAW**

"Federal preemption occurs when a state law is invalidated because it conflicts with federal law," including "when it is impossible to comply with both federal and state law." CMO 46, at *7 (citing *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010)). Under the U.S. Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555 (2009), conflict preemption precludes state-law claims based on a pharmaceutical manufacturer's alleged failure

to provide warnings on FDA-approved labeling "only where the manufacturer can provide 'clear evidence' that the FDA would have rejected attempts by the manufacturer to make the change to the label that plaintiffs contend was omitted."  CMO 46, at *7.

**A.**     **Clear Evidence Shows that FDA Would Have Rejected an Attempt by Auxilium to Add a CV Risk Warning While Mr. Holtsclaw Used Testim**

In *Cerveny v. Aventis, Inc.*, 855 F.3d 1091 (10th Cir. 2017), the Tenth Circuit held "that the rejection of a citizen petition may constitute clear evidence that the FDA would have rejected a manufacturer-initiated change to a drug label" where "FDA analyzed claims and data virtually identical to those submitted by" plaintiffs, and FDA "concluded that warnings were unjustified" under "the standard that would have applied to a change proposed by" the manufacturer.  *Id.* at 1105.  Similarly, in *In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108 (S.D. Cal. 2015), the court held that plaintiffs' failure to warn claims were preempted where "FDA has considered pancreatic cancer risk, the specific issue Plaintiffs allege Defendants should have warned of," and "has also consistently concluded that a causal association between the drugs and pancreatic cancer is indeterminate."  *Id.* at 1123; *see also Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 769 (S.D. Ohio 2015) ("[B]ecause the FDA rejected Abbott's 2005 PAS, it likely would have rejected an earlier-submitted CBE seeking to add the same language to the label that it eventually rejected in the PAS."); *cf. Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 873 (7th Cir. 2010) (affirming denial of plaintiffs' motion to add a breach of implied warranty claim days before trial as unlikely to succeed because "a court cannot order a drug company to place on a label a warning if there is 'clear evidence' that the FDA would not approve it," and "'clear evidence in this case is the agency's refusal to require a reference to [the injury incurred by plaintiff] on the label of over-the-counter drugs containing

14

ibuprofen, when it had been asked to do so in the submission to which the agency was responding" (internal quotation marks omitted)).

Here, on three separate occasions pre and post-dating Mr. Holtsclaw's Testim use, FDA determined that the warning Mr. Holtsclaw contends Auxilium should have included on Testim labeling was not justified by reasonable evidence of an association of CV risk with Testim.

- In 2010, FDA determined based on the results of the TOM trial, which involved Testim, and other then-available evidence that "the studies did not support an association between testosterone therapy and an increased risk of adverse cardiovascular outcomes." Ex. 9 at 6–7. Significantly—and distinct from the AbbVie bellwether record, this FDA determination was based on the very product at issue, Testim, in Mr. Holtsclaw's case.

- Significantly—and distinct from the AbbVie bellwether record—on June 2, 2014, FDA rejected Auxilium's proposed labeling change to warn broadly of "thrombosis and embolic events," medical terminology which would have encompassed CV risk, including specifically heart attack and stroke. Ex. 1 at 35662.

- On July 16, 2014—just thirteen days after Mr. Holtsclaw stopped using Testim— FDA reiterated its determination when it denied the Petition after review of additional evidence because "at this time, there is insufficient evidence of a causal link between testosterone therapy and adverse cardiovascular outcomes . . . ." Ex. 9 at 1, 5.

It is particularly significant that FDA denied the Petition *after* Mr. Holtsclaw stopped using Testim. In *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010), the court held that FDA rejection of citizens petitions did not establish "clear evidence" that FDA would have rejected a proposed labeling change from the manufacturer where "the latest of these findings was made several years *before*" the injury. *Id.* at 395 (emphasis added). As the Court explained, "[t]his temporal gap is especially important in the analysis of prescription drugs because it constantly evolves as new data emerges." *Id.*

In Mr. Holtsclaw's case, there is no such temporal gap. The FDA determination that "there is insufficient evidence of a causal link between testosterone therapy and adverse cardiovascular outcomes" *post-dated* Mr. Holtsclaw's injury. FDA's determination that the

scientific evidence available when Mr. Holtsclaw used Testim did not support a warning that Testim was associated with CV risk is clear evidence that FDA would not have approved a proposal by Auxilium to add that warning.

### B. Clear Evidence Shows that FDA Would Have Rejected an Attempt by Auxilium to Add a VTE Risk Warning While Mr. Owens Used Testim

Although the Testim labeling warned Mr. Owen's prescribing doctor and Mr. Owens about the risk that he incurred—blood clots in his legs—Mr. Owens contends that Auxilium should have added a warning about alleged VTE risk. FDA did not require any disclosure on Testim labeling regarding VTE until seven months after Mr. Owens DVT diagnosis, and then it only required Auxilium to warn that there had been "postmarketing events of venous thromboembolic events . . . in patients using testosterone products, such as Testim." Even had Auxilium known that information prior to or during the time that Mr. Owens used Testim, it would not have been permitted to add that information to Testim labeling prior to FDA approval because reports of adverse events alone are not "evidence of a causal association that satisfies the standard for inclusion in the labeling." 21 C.F.R. § 201.57(c)(6)(i); 21 C.F.R. § 314.70(c)(6)(iii)(A); *see* 21 C.F.R. § 314.80(a) (manufacturers must report "[a]ny adverse event associated with use of a drug in humans, whether or not considered drug related").

There is good reason for FDA concern about manufacturers adding risk warnings to labeling without reasonable scientific evidence of association. "While it is important for a manufacturer to warn of potential side effects, it is equally important that it not overwarn because overwarning can deter potentially beneficial uses of the drug by making it seem riskier than warranted and can dilute the effectiveness of valid warnings." *Mason*, 596 F.3d at 392; *see also Cerveny*, 855 F.3d at 1102 ("FDA views overwarnings as problematic because they can render the warnings useless and discourage use of beneficial medications"). Consequently, a

manufacturer violates the FDCA if it proposes a CBE labeling change absent reasonable evidence of an association of a serious hazard. *See id.* (citing 18 U.S.C. § 1001). Allowing Plaintiffs' state law failure to warn claims to proceed under the facts of these cases, would encourage Auxilium (and pharmaceutical manufacturers generally) to add warnings on the slightest suggestion of a possible association of any risk before evaluation of the evidence to assess its scientific merit, which would be detrimental to public health.

**C.     The Testim Regulatory Record Satisfies the Court's Preemption Criteria**

The regulatory record here is fundamentally distinguishable from the AbbVie AndroGel bellwether cases. Based on the Testim regulatory record, including FDA's express rejection of Auxilium's proposed language that would have encompassed CV risk, the Court should find that the criteria for federal pre-emption are satisfied. In addition, the Court should reconsider the argument, which it rejected, that the FDA's denial of the Petition constitutes clear evidence that it would have rejected a manufacturer proposal regarding CV risk. CMO 46, at *10–11.

The Court relied on the FDA's statement in response to the Petition that "the evidence might demonstrate a 'possible safety signal'" and warranted further study to find that FDA's "rejection of the warnings is not 'clear-cut,' . . . because the agency itself indicated the possibility of future action." *Id.* at *10. But the possibility of future action always exists because "the analysis of prescription drugs . . . constantly evolves as new data emerges." *Mason*, 596 F.3d at 395. That does not detract from FDA's determination that there was "insufficient evidence of a causal link" to justify a CV risk warning "at this time," *i.e.*, when Mr. Holtsclaw used Testim. Ex. 9 at 5.

The Court also suggested that FDA might have treated a proposal from a manufacturer differently from a proposal in a citizen petition. CMO 46, at *10. But, "the FDA standard does not discriminate between proposals submitted by manufacturers and proposals submitted by

citizens." *Cerveny*, 855 F.3d at 1102; *accord In re Incretin-Based Therapies*, 142 F. Supp. 3d at 1125 n.18 ("Regardless of what prompts the FDA's review of an issue, whether as part of initial drug approval, a CBE submission, or the FDA's own review of a safety signal, the same regulatory standard applies.").

Finally, the Court held that FDA might have been reluctant to grant the relief sought in the Petition because it sought a class warning on the labeling of all TRT medicines, rather than a warning only on the labeling of a specific TRT medicine. CMO 46, at *11. But when FDA required labeling changes regarding VTE and CV events, it did so on a class basis. Indeed, Plaintiffs allege that the risks they have identified are associated with *all* TRT medicines—not with Testim or any other specific TRT medicine alone. Had FDA granted the Petition, it would have resulted in a change to Testim labeling.[4] Because FDA rejected the change as not warranted by scientific evidence available at the time, Plaintiffs' claims are preempted.

## II. PLAINTIFFS' CLAIMS CHALLENGING TESTIM'S FDA-APPROVED DESIGN ARE PREEMPTED BY FEDERAL LAW

Even assuming Plaintiffs had asserted any legitimate design defect claims, the Court should grant summary judgment on them because those claims are preempted by federal law.[5] In *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013), the Supreme Court held that a state law design defect claim against a pharmaceutical manufacturer was preempted by federal law. Although *Bartlett* involved a generic medicine, the principle it established applies equally to brand name medicines like Testim: "Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or

---

[4] By contrast, in *Mason*, FDA rejected a citizen petition directed to a different medicine in the same class as the medicine that injured the plaintiff. *Mason*, 596 F.3d at 395. Had FDA granted the relief sought, it would not have resulted in a change to the labeling of the medicine at issue.

quantitative formulation of the drug product . . . or in the specifications provided in the approved application.'" *Id.* at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

Applying *Bartlett*, the Sixth Circuit has held that federal law preempted state law design defect claims against a brand-name pharmaceutical manufacturer. *See Yates v. Ortho-McNeil-Janssen Pharm.*, 808 F.3d 281, 293 (6th Cir. 2015). In affirming summary judgment, the Sixth Circuit rejected the plaintiff's theory that the manufacturer should have changed the design of its birth control medicine after FDA approval as "clearly preempted by federal law" because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the "qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved application." *Id.* at 298 (quoting 21 C.F.R. § 314.70(b)(2)(i)). As the court explained, "[b]ased on the plain meaning of the regulation," the manufacturer "could not have altered the dosage of estrogen . . . without submission to the FDA and the agency's 'approval *prior to* distribution of the product made using the change.'" *Id.* (quoting 21 C.F.R. § 314.70(b)(2)(i) (emphasis by court)).

The Sixth Circuit also rejected plaintiff's alternative theory that the manufacturer should have sought to market a lower-dose medicine in the first instance, among other reasons, because it was "too attenuated" as it would require speculation regarding FDA approval of the alternative design. *Id.* at 299. The court also noted that "contending that defendants' pre-approval duty would have resulted in a birth control patch with a different formulation, [plaintiff] essentially argues that defendants should never have sold the FDA-approved formulation of [the patch] in

---

[5] This Court did not rule on preemption of the AbbVie bellwether plaintiffs' design defect claims because it resolved those claims on alternative grounds. CMO 46, at *11, *20.

the first place." *Id.* at 300. The court "reject[ed] this never-start selling rationale for the same

reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale . . . ." *Id.*; *see also*

*Bartlett*, 133 S. Ct. at 2470 (rejecting contention that a manufacturer could comply with state and

federal law duties by "pull[ing the medicine] from the market").[6]

      The Court should reach the same result here because Auxilium cannot modify Testim's

design absent FDA approval.

## CONCLUSION

      For the foregoing reasons, the Court should grant Defendants' motion for summary

judgment on Plaintiffs' state law claims for failure to warn and design defect on the ground that

they are preempted by federal law.

Dated: September 11, 2017             Respectfully submitted,

                              */s/ Andrew K. Solow*
                              Andrew K. Solow (*pro hac vice*)
                              **ARNOLD & PORTER KAYE SCHOLER LLP**
                              25O West 55th Street
                              New York, NY 10019-9710
                              Phone: (212) 836-7740
                              Fax: (212) 836-6776
                              Email: andrew.solow@apks.com

                              Pamela J. Yates (*pro hac vice*)
                              **ARNOLD & PORTER KAYE SCHOLER LLP**
                              777 South Figueroa Street, 44th Floor
                              Los Angeles, CA 90017-5844
                              Phone: (213) 243-4178
                              Fax: (213) 243-4199
                              Email: pamela.yates@apks.com

---

[6] *Accord Fleming v. Janssen Pharm., Inc.*, 186 F. Supp. 3d 826, 832–34 (W.D. Tenn. 2016) (state law design defect claims preempted); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185–86 (S.D.N.Y. 2016) (same); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 873 (N.D. Ohio 2014) (same).

*Attorneys for Endo Pharmaceuticals Inc.,
Auxilium Pharmaceuticals, LLC (f/k/a Auxilium
Pharmaceuticals, Inc.), and GlaxoSmithKline
LLC*

**CERTIFICATE OF SERVICE**

I, Andrew K. Solow, certify that on September 11, 2017, I served a true and correct copy

of the foregoing Defendants' Motion and Memorandum of Law in Support of Motion for

Summary Judgment on the Ground that Plaintiffs' State Law Failure to Warn and Design Defect

Claims are Preempted by Federal Law on counsel of record by electronic notice through the

CM/ECF system of the United States District Court for the Northern District of Illinois.

Dated: September 11, 2017                    /s/ Andrew K. Solow
                                             Andrew K. Solow, (*pro hac vice*)

64677612